WEIL, GOTSHAL & MANGES LLP
Attorneys for Debtors and Debtors
   in Possession
767 Fifth Avenue
New York, New York 10153
(212) 310-8000
Richard P. Krasnow, Esq. (RK 5707)

FINAL HEARING:
February ____, 1999
____:__.m.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x

In re                                                         :

                                                              : Chapter 11 Case No.
COUNTY SEAT STORES, INC., *et al.*,         : 99-
                                                              : (Jointly Administered)
            Debtors.                                  :

--------------------------------------------------------------x

MOTION FOR ORDERS PURSUANT TO SECTION
364(c)(2) and (c)(3) OF THE BANKRUPTCY CODE
AND FED. R. BANKR. P. 4001(c) AUTHORIZING
DEBTORS TO OBTAIN POSTPETITION FINANCING
(i) ON A PERMANENT BASIS AND SCHEDULING A
FINAL HEARING THEREON AND (ii) ON AN INTERIM
<u>BASIS PENDING THE FINAL HEARING</u>

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

County Seat Stores, Inc. ("County Seat") and CSS Trade Names, Inc. ("CSS," and collectively, with County Seat, the "Debtors"), respectfully represent:

<u>Background</u>

1. On the date hereof (the "Commencement Date"), each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of title 11, United States Code (the "Bankruptcy Code").

2. Each of the Debtors is continuing to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

## Jurisdiction and Venue

3. This Court has jurisdiction to consider this motion pursuant to 28 U.S.C. §§ 157 and 1334. Consideration of this motion is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue of this proceeding is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## The Debtors' Businesses

4. County Seat, a publicly held corporation, is among the nation's largest mall-based specialty retailers of casual apparel, operating approximately 422 stores in 41 states in the midwestern, southern and eastern regions of the United States and a distribution center in Baltimore, Maryland. County Seat's products are primarily manufactured under private label and its merchandise mix consists of casual shirts, sweaters, knit tops, khaki pants, cargo pants, corduroy pants, jeans, dresses and accessories for men, women and teens. CSS owns certain service marks which it licenses to County Seat.

5. For the fiscal year ended 1997, County Seat reported net sales of approximately $394,584,000. As of the quarter ended October 31, 1998, the books and records of County Seat reflect assets of $210,000,000 and liabilities of $166,000,000. As of October 31, 1998, County Seat employed an average of approximately 7,400 full-time and part-time employees.

The Debtors' Prepetition Financing

6.      County Seat, like most retailers, operates on a year-round basis but has a seasonal pattern of sales and earnings.  Its two major selling seasons are back-to-school (third quarter) and holiday (fourth quarter).  In anticipation of this, there is a build-up of working capital requirements during the second and third quarters – usually peaking in October, as goods are ordered and produced.  For goods manufactured overseas, there is generally a three month lag time between the date on which an order is placed and the date on which the goods are received by County Seat in the United States.  Due to the seasonality of sales and year-round sourcing requirements, County Seat has used short-term financing through revolving credit borrowings and letters of credit to meet its seasonal working capital requirements.

7.      To enable County Seat to satisfy its working capital requirements, including payroll, utilities, rent, capital expenditures, and amounts owed to merchandise vendors and suppliers, and to satisfy its payment obligations under the confirmed plan of reorganization in its prior chapter 11 case, on or about October 29, 1997,County Seat obtained a three-year $115 million working capital facility, including a $90 million sublimit for letters of credit and bankers' acceptances (the "Prepetition Credit Facility") with a syndicate of lenders including BankBoston Retail Finance Inc. (as agent and lender) ("BankBoston"), BankAmerica Business Credit, Inc., Congress Financial Corporation (Central), Foothill Capital Corporation, FINOVA Capital Corporation, and The CIT Group/Business Credit, Inc. (collectively, the "Prepetition Lenders").  Borrowings under the Prepetition Credit Facility are made and repaid on a daily basis, secured by substantially all of the assets of County Seat (other than leasehold interests

and property remaining in the chapter 11 disputed claims reserve), and of CSS, as guarantor. Thus, substantially all the assets of the Debtors are pledged to secure the Debtors' obligations under the Prepetition Credit Facility.

8. In an effort to address its short-term liquidity crisis, County Seat requested in November 1998 that its Prepetition Lenders agree to increase the company's advance rate to provide the company with additional borrowing capacity. The lenders refused. However, after a series of discussions, the Prepetition Lenders agreed to amend the working capital facility to provide County Seat with an overadvance in the amount of $2.5 million through November 27, 1998.

9. On December 2, 1998, as a result of its reduced earnings before interest, depreciation and amortization, County Seat was notified by its Prepetition Lenders of its default under the Prepetition Credit Facility's fixed charge coverage ratio requirement. This default entitled the Prepetition Lenders to, among other things, accelerate the indebtedness outstanding thereunder and cause the same to become immediately due and payable. Although the Prepetition Lenders did not accelerate, they did decrease the Debtor's advance rates and letter of credit sublimits significantly, and further, informed County Seat that any further accommodations to extend credit would be at their sole discretion.

10. As of the date hereof, approximately $20 million of direct borrowings is outstanding under the Prepetition Credit Facility and the Debtors are contingently liable for reimbursements in respect of $14 million in face amount of outstanding letters of credit and/or bankers' acceptances issued thereunder. Such letters

of credit and/or bankers' acceptances relate to merchandise that is anticipated to be received subsequent to the Commencement Date.

## The Debtors' Need for Postpetition Financing Arrangements

12. County Seat, in the normal course of its business, incurs obligations to employees, landlords, and other suppliers for a variety of goods and services essential to the continued operations of its business. Absent the immediate availability of cash, credit, and postpetition financing, County Seat's suppliers may refuse both to honor outstanding purchase orders and continue to supply other merchandise necessary for it to conduct its business in the ordinary course. Moreover, it would not have the funds necessary to make payroll. In addition to providing the funds necessary to meet County Seat's immediate cash needs, the availability of postpetition financing will instill a sense of confidence in County Seat's suppliers, customers, and employees.

## Relief Requested

12. By this Motion, and pursuant to sections 364(c)(1), 364(c)(2), 364(c)(3) of the Bankruptcy Code and Fed. R. Bankr. P. 4001, the Debtors request that the Court (a) schedule a hearing (the "Final Hearing") to consider entry of an order, the form of which is attached hereto as Exhibit "A" (the "Final Order"), authorizing the Debtors to incur secured postpetition indebtedness on a permanent basis up to an aggregate principal amount of $75 million, as follows: (i) up to a maximum principal amount of $70 million, including a sublimit of $50 million for letters of credit and bankers' acceptances, on the terms set forth in the Loan and Security Agreement, between County Seat as borrower and BankBoston (as agent and lender) and the lenders identified therein, substantially in the form annexed hereto as Exhibit "B" (the

"Revolving Loan Facility"), guaranteed by CSS substantially in the form annexed hereto as Exhibit "C" and (ii) up to a maximum principal amount of $5 million, on the terms set forth in the Term Loan and Security Agreement, between County Seat, as borrower and Back Bay Capital Funding, LLC, as lender ("Back Bay," and collectively, with the Revolving Loan Facility lenders, the "DIP Lenders"), substantially in the form annexed hereto as Exhibit "D" (the "Tranche B Facility," and together with the Revolving Loan Facility, the "DIP Facility"), guaranteed by CSS substantially in the form annexed hereto as Exhibit "E" and (b) pending entry of an order following the conclusion of the Final Hearing, authorize the Debtors to incur secured postpetition indebtedness under the DIP Facility on an interim basis up to a maximum principal amount of $40 million, including a sublimit of $16 million in respect of letters of credit and bankers' acceptances, and including $5 million under the Tranche B Facility, on the terms and subject to the conditions set forth in the proposed order attached hereto as Exhibit "F" (the "Interim Order").

13. Section 364(c) of the Bankruptcy Code provides that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, the court, after notice and a hearing, may authorize the debtor to obtain credit or incur debt on, <u>inter</u> <u>alia</u>, the following basis:

> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3) secured by a junior lien on property of the estate that is not otherwise subject to a lien.

11 U.S.C. § 364(c)(1), (2), and (3).

14. Fed. R. Bankr. P. 4001(c), which governs the procedures for obtaining postpetition financing, provides in relevant part:

> (2) *Hearing*. The court may commence a final hearing on a motion for authority to obtain credit no earlier than 15 days after service of the motion. If the motion so requests, the court may conduct a hearing before such 15 day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

Fed. R. Bankr. P. 4001(c).

15. Accordingly, this Court is authorized to grant the relief requested.

### The DIP Facility

16. In order to continue to operate, the Debtors have determined, in the exercise of their sound business judgment, that they require the Revolving Loan Facility and Tranche B Facility to obtain funds to finance the operations of County Seat.

17. Prior to the Commencement Date, the Debtors sought postpetition financing from various financial institutions, including the Prepetition Lenders. Ultimately, the DIP Lenders, which, with the exception of Back Bay, consist of all of the Prepetition Lenders (other than BankAmerica Business Credit, Inc.), were the only prospective postpetition lenders that agreed to accommodate both the advance rates required by the Debtors and the timetable for funding.

18. By virtue of the perspective and knowledge of the Debtors' businesses possessed by BankBoston, the need for expedition, the fact that no other lender offered to meet the Debtors' working capital requirements on a timely basis, and the fact that substantially all of the Debtors' prepetition assets are encumbered by liens held by BankBoston, as the prepetition agent on behalf of the Prepetition Lenders, the

Debtors concluded that debtor-in-possession financing from the DIP Lenders presented the best options for the preservation of the Debtors' businesses and addressed the Debtors' working capital needs. The proposals received from BankBoston and BackBay are competitive and address the Debtors' working capital needs.

19. BankBoston has indicated its willingness to make loans to and issue letters of credit for the account of County Seat, but only in accordance with and on the terms set forth in the Revolving Loan Facility, the salient terms which are summarized, as follows:[1]

> Borrower. County Seat
>
> Guarantor. CSS
>
> Commitment. Up to $70 million, including a $50 million sublimit for letters of credit and bankers' acceptances
>
> Interest. BankBoston's Base Rate + 0.75% or LIBOR + 2.5%
>
> Conditions Precedent: Including County Seat's receipt of Tranche B Facility proceeds aggregating $5 million and intercreditor agreement among BankBoston, Back Bay, and County Seat
>
> Maturity. January 22, 2001
>
> Termination: Earliest of (i) maturity, (ii) notice of acceleration based upon Event of Default, (iii) effective date of a confirmed plan, and (iv) date irrevocably set by County Seat in written note given between 7 and 30 days prior to date so set.
>
> Use of Proceeds: Borrowings to be used first to repay obligations under Prepetition Credit Facility, and thereafter, for working capital and general corporate purposes in accordance with business plan. Outstanding letters of credit under Prepetition Credit Facility to constitute postpetition obligations under facility.

---

[1] This summary is qualified in its entirety by reference to the provisions of the Revolving Loan Facility.

Security/Priority.  Pursuant to Bankruptcy Code sections 364(c)(2) and (c)(3), obligations secured by first priority liens on and security interests in substantially all Debtors' property and interests (including leasehold interests) whether now owned or hereafter acquired, subject to (i) during the continuance of an Event of Default the unpaid fees and expenses of professionals retained by the Debtors or any statutory committee appointed in the Debtors' chapter 11 cases allowed by the Court in an aggregate (noncumulative) amount of $250,000 for the period through 2/29/99, $500,000 through 3/31/99, $750,000 through 4/30/99, and effective 5/1/99, $1 million (the "Carve-Out") and; (ii) Permitted Encumbrances, including prepetition liens, liens arising by operation of law that are not material in the aggregate, utility and landlord deposits, capital lease obligations); and (iii) the statutory fees of the United States Trustee incurred pursuant to 28 U.S.C. § 1930(a) and fees of the Clerk of the Bankruptcy Court.

Availability.  The lesser of (i) $70,000,000 minus (a) unpaid principal balance, minus (b) Availability Reserves, minus (c) the Carve-Out, minus (d) stated amount of outstanding letters of credit and bankers' acceptances and (ii) the then-applicable advance rate (between 54% to 68% of cost value of eligible inventory (but not to exceed 85% of appraised value) of Cost of (a) Acceptable Inventory, minus (b) Inventory Reserves, minus (c) unpaid principal balance, minus (d) Availability Reserves, minus (e) the Carve-Out, minus (f) stated amount of outstanding letters of credit and bankers' acceptances.

Fees and Expenses:

> Agency Fee:  $150,000, payable as follows:$75,000 at closing and $75,000 on the first anniversary date; plus reimbursement of Agent's out-of-pocket expenses
>
> Upfront Fee:  $700,000, payable at closing
>
> Unused Line Fee:  .375% per annum on the average daily unused amount
>
> Letter of Credit and Bankers' Acceptance Fees:  1.75% per annum on the average daily face amount, plus usual and customary bank handling fees & charges
>
> Early Termination Fee:  Termination before first anniversary of closing: 1% of line commitment.  Termination thereafter: 0.5% of line commitment

Representations, Warranties, and Covenants.   Those customary in transactions of this type.  In addition, County Seat will not (i) commit to, or open, any location at which County Seat maintains, offers for sales, or stores any of the collateral except that County Seat may open up to 15 such locations in fiscal year 1999 and 30 such locations in fiscal year 2000, on prior notice to the lenders, (ii) enter into any real property lease, except as permitted under (i), above, (iii) reject or shorten the term of any real property lease without BankBoston's consent or Bankruptcy Court order, on notice to Back Bay, (iv) other than as permitted under (iii), above, modify any real property lease unless such modification is more favorable to County Seat than the then-existing terms.

Events of Default. Including: (i) failure to pay principal when due; (ii) failure to pay when due any other Liability under the Loan Documents for a period longer than five consecutive days; (iii) failure to comply with covenants and Liabilities relating to location of collateral, title to assets, indebtedness, insurance policies, affiliate transactions, dividends and investments, loans, line of business, affiliate transactions, annual financial statements, financial performance, and cash management; (iv) failure to comply with certain financial reporting and performance requirements after expiration of applicable grace periods; (v) failure of any representation or warranty to be true in all material respects when given or confirmed; (vi) the conversion to a case under chapter 7 of the Bankruptcy Code; (vii) the appointment of a trustee or an examiner with expanded powers to operate the business; (viii) the occurrence of an event such that after giving effect to applicable grace periods, (A) postpetition indebtedness owed to any other creditor which could be accelerated exceeds $2 million or (B) the Tranche B Facility obligations could be accelerated; (ix) material default in a required postpetition payment under a lease which could have a material adverse effect on the business or operations of County Seat; (x) breach or default (after expiration of any applicable grace periods) under any Loan Document; (xi) uninsured theft, damage or destruction of or to any material portion of the collateral or the sale of any material portion of assets, which is outside the ordinary course of business or otherwise not permitted under the facility; (xii) indictment or institution of proceedings where reasonable likelihood of relief available could result in material adverse restraint on Debtors' conduct or business in the ordinary course (xiii) entry of an unstayed money judgment which, when aggregated with other unsatisfied and unstayed or unappealed money judgments exceeds $2 million; (xiv) (a) any challenge by or on behalf of Debtors to the validity, applicability, or enforceability of any Loan Document strictly in accordance with its terms or which seeks to materially adversely affect any security interest created by or in any Loan Document or any payment made thereunder, or (b) any judicial determination that any Loan Document is not enforceable in accordance

with its terms or which adversely affects any security interest created by any Loan Document or any payment made thereunder, (xv) death disability or failure of Sam Forman or Allen Weiss to exercise authority and discharge management responsibilities after 75 days from such occurrence unless waived by BankBoston or notice of acceleration is not given within 120 days; (xvi) any change in control relating to membership of County Seat's board of directors; (xvii) a change in the Final Order or the entry of an order which affects the effectiveness of the Final Order; and (xiii) the entry of an order granting relief from the automatic stay in connection with a material claim against County Seat.

Remedies.  Upon the occurrence of an event of default, and after five business days' notice that is filed with the Bankruptcy Court, with a copy to Chambers, together with proof of service thereof, and served on the Debtors and their counsel, counsel to any statutory committee of creditors appointed in these chapter 11 cases, the United States Trustee, and any person filing a notice of appearance and request for service, the automatic stay will be lifted unless otherwise ordered by the Court, and BankBoston may:

- Exercise rights and remedies of a secured party upon default under the UCC

- Collect and sell collateral (including going out of business sales)

- Occupy County Seat's premises. Under the proposed order, in the exercise of its rights and remedies, BankBoston will be (i) obligated to pay base rent only with respect to its use and occupancy of the Debtor's premises and (ii) authorized to take certain actions in connection with going-out-of-business sales, including the hiring of the Debtor's employees and others to assist with such sales, the augmentation of the Debtor's inventory, and the use of the Debtor's operational infrastructure.

    In addition, all parties, including landlords, utilities, government agencies, and creditors will be enjoined from interfering with any sales, the maintenance of inventory, the use of operational infrastructure, or from seeking process before any court which will impede the conduct of any sale.  The conduct of any sale or disposition may be made without compliance with any licensing law, statute, ordinance, or regulation except those incident to the protection of public safety.

20. Back Bay has indicated its willingness to make a loan for the account of County Seat, but only in accordance with and on the terms set forth in the Tranche B Facility, the salient terms of which are summarized, as follows:[2]

>Borrower: County Seat
>
>Guarantor: CSS
>
>Commitment: $5 million term loan
>
>Interest: 19% per annum, as follows: (i) 15% per annum payable monthly in arrears commencing 2/1/99 and on the Maturity Date and (ii) 4% per annum accruing monthly to be added to the principal balance commencing 2/1/99 and bearing interest at 15% per annum
>
>Conditions Precedent: Including intercreditor agreement among Back Bay, BankBoston, and County Seat and contemporaneous closing on Revolving Loan Facility
>
>Maturity: The earlier of (i) January 22, 2001, or (ii) the date the Revolving Loan Facility has been terminated and all indebtedness thereunder is due and payable
>
>Use of Proceeds: Solely to refinance the Prepetition Credit Facility
>
>Security/Priority: Same as described above
>
>Fees & Expenses:
>
>>Upfront Fee: $300,000, payable as follows: $150,000 upon the making of the term loan and $150,000 on 1/19/00 (or upon acceleration)
>>
>>Collateral Monitoring Fee: $40,000, payable as follows: $20,000 upon the making of the term loan and $20,000 on 1/19/00 (or upon acceleration)
>
>Representations, Warranties and Covenants. Same as described above
>
>Events of Default. Same as described above

---

[2] This summary is qualified in its entirety by reference to the provisions of the Tranche B Facility.

Remedies.  Same as described above

## The Proposed Debtor-In-Possession
## Financing Arrangement Should Be Authorized

21. The Debtors urgently need debtor-in-possession financing in order to operate their businesses and accomplish any restructuring under chapter 11 of the Bankruptcy Code.

22. The financing to be provided under the DIP Facility will enable the Debtors to, among other things, (a) maintain the continuity of operations, (b) minimize the disruption caused by the filing of the Debtors' chapter 11 cases, (c) make payments in connection with outstanding obligations to suppliers, employees, contractors and others, and (d) maximize the value of their businesses.  In addition, the availability of credit should instill confidence in County Seat's suppliers and encourage them to extend trade credit to County Seat, thereby enabling the Debtors to preserve their estates and successfully reorganize as contemplated by chapter 11 of the Bankruptcy Code.

23. As noted above, each of the DIP Lenders has required as a condition to its respective facility that County Seat use the initial borrowings to repay the amounts outstanding under the Prepetition Credit Facility and that the outstanding letters of credit be deemed postpetition liabilities under the DIP Facility.  Further, the Prepetition Lenders' claim will be allowed in an amount not less than $18 million.  The Debtors believe that no creditors or other parties in interest will be harmed by such repayment because the Prepetition Credit Facility is a valid, legally binding obligation of County Seat, guaranteed by CSS, and secured by validly perfected, nonavoidable security interests on collateral of the Debtors having a value greater than the approximately $20

million in direct borrowings and the $14 million in contingent letter of credit obligations thereunder. As set forth in the proposed Interim Order and Final Order, notwithstanding such allowance and payment, funds received by the Prepetition Lenders as a result of the Debtors' satisfaction of their obligations under the Prepetition Credit Facility are subject to disgorgement upon a successful challenge by the creditors' committee initiated within the sixty-day period following the entry of an order approving the committee's retention of counsel. Moreover, similar relief has been granted in other cases. *See In re Cityscape Fin. Corp.*, No. 98-22569 & -22570 (ASH) (Bankr. S.D.N.Y. Oct. 1998); *In re Caldor, Inc.*, No. 95-44080 (JLG) (Bankr. S.D.N.Y. 1995).

The Interim Order Should Be Approved

24.     Pending a final hearing on this Motion, the Debtors require the availability of immediate credit under the DIP Facility in the amount of up to $45 million, including a sublimit of $20 million for letters of credit and bankers' acceptances, and including $5 million under the Tranche B Facility. Such use of credit is necessary to enable the Debtors to satisfy certain basic, required operating expenses, such as obligations to suppliers, payroll, rent and utilities. The approval of credit on an interim basis will allow the Debtors to continue their operations uninterrupted for the benefit of all parties in interest during this transitional period in which the suppliers are most likely to insist upon more stringent credit terms.

25.     The Interim Order is essential to County Seat's ability to satisfy its payroll, pay for goods sold and delivered, and otherwise meet its daily operating needs. The Debtors are unable to obtain unsecured credit or debt allowable as administrative

expense under section 503(b)(1) of the Bankruptcy Code in an amount sufficient and readily available for County Seat to maintain ongoing operations.

26. Based on the foregoing, the consequences of leaving the Debtors with inadequate liquidity would be fatal to their reorganization efforts. Absent the Debtors' ability to obtain interim financing for continuing normal business operations, County Seat would have to terminate operations, with concomitant harm to the value of the Debtors' overall business enterprises. Consequently, if the Debtors are unable to obtain the interim financing requested, their estates are certain to suffer immediate and irreparable harm.

### Good Faith

27. The terms and provisions of the Revolving Loan Facility and the Tranche B Facility are fair and reasonable, and were negotiated by the parties in good faith and at arms' length. Consequently, the Debtors request that the Court find that any loans or advances made by the DIP Lenders under the Revolving Loan Facility or the Tranche B Facility pursuant to the Interim Order are made in good faith for the purposes of section 364(e) of the Bankruptcy Code.

### Memorandum of Law

28. The Debtors submit that the relevant legal authorities are set forth herein and that the requirement pursuant to Local Bankruptcy Rule 9013-1 that the Debtors file a memorandum of law in support of this motion is satisfied.

### Notice

29. No trustee, examiner, or creditors' committee has been appointed in the Debtors' chapter 11 cases. Notice of the interim relief requested herein has been

given to the Office of the United States Trustee for the Southern District of New York. As set forth in the Interim Order, the Debtor's propose to give notice of the Final Hearing to (i) the Office of the United States Trustee for the Southern District of New York, (ii) the holders of the twenty largest unsecured claims against the Debtors, (iii) the indenture trustee for the holders of County Seat's public debt, (iv) the District Director of the Internal Revenue Service, (v) the United States Attorney for the Southern District of New York, (vi) all nonresidential real property lessors of the Debtors, (vii) all creditors having filed UCC-1 financing statements or having recorded a mortgage on the real or personal property of the Debtors, (viii) all parties having filed requests for notices in the Debtors' cases, and (ix) the attorneys general of each state in which the Debtors conduct their businesses. The Debtors submit that no other notice need be given.

30. No previous application for the relief requested herein has been made to this or any other court.

WHEREFORE the Debtors respectfully request (i) entry of (a) the Interim Order granting the relief requested herein and scheduling the Final Hearing and (b) the Final Order granting the relief requested herein following the conclusion of the Final Hearing and (ii) such other and further relief as is just.

Dated: New York, New York
       January 22, 1999

/s/Richard P. Krasnow
Richard P. Krasnow (RK 5707)

WEIL, GOTSHAL & MANGES LLP
Attorneys for the Debtors and Debtors
in Possession
767 Fifth Avenue
New York, New York 10153
(212) 310-8000